UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| EUNICE M. SPEARS, et al., | ) | |
| | ) | |
|     Plaintiffs | ) | |
| | ) | Case No. 1:07-CV-58 |
| v. | ) | |
| | ) | Chief Judge Curtis L. Collier |
| MICHAEL COOPER, et al., | ) | |
| | ) | |
|     Defendants. | ) | |

**<u>MEMORANDUM</u>**

Before the Court are two motions for summary judgment. The first has been filed by Defendants Matthew Ruth, Wes Snyder, and the City of Cleveland, Tennessee (collectively the "Cleveland Defendants") (Court File No. 122). The second has been filed by several individual Defendants (Michael Cooper, Robert Gruver, Richard Cobble, Marshall Hicks, Joleen Hickman, Judy Gilley, Jason Gaddis, Ben Linder, Tony Moore, Allan Walsh, Mike Boggess, Bill Burtt, Calvin Webster, Connie Berger, Terri Nunley, Dan Gilley, and Bill Griffith) as well as Bradley County, Tennessee (collectively the "Bradley County Defendants") (Court File No. 124). Each motion is supported by an accompanying memorandum (Court File Nos. 123, 126). Plaintiffs Eunice McCargo Spears, Christie McCargo, Madeline McCargo, and Clay McCargo ("Plaintiffs") have filed responses (Court File Nos. 135, 136) and Defendants filed replies (Court File Nos. 139, 140). The Court has considered these filings, along with accompanying affidavits and other discovery materials, in reaching its ruling.

For the following reasons, the Court will **GRANT IN PART** and **DENY IN PART** the Defendants' motions for summary judgment.

# I.  FACTS AND PROCEDURAL HISTORY

On February 24, 2006, employees of the police department in the city of Cleveland, Tennessee received a call that a black male was lying in the roadway (Anderson Dep. Ex. 6).  The dispatcher informed the responding officer, Matthew Ruth of the Cleveland Police Department, that the man was on drugs, had been "running up and down the street," and was "acting like he has bugs crawling on him and in his pockets and thinks they are coming to get him" (*id.* Ex. 1).  Ruth arrived on the scene at 4:28 p.m. and, after speaking with the man, identified him as Christopher McCargo (*id.* Ex. 4).  Ruth noticed McCargo emanated "a strong odor of marijuana" (Ruth Aff. ¶ 4).  McCargo told Ruth he had been drinking, smoking crack cocaine and marijuana (*id.* ¶ 5), and that he had been "running from dogs" (*id.*).  Ruth thought McCargo appeared intoxicated (*id.*).

Approximately three minutes after Ruth's arrival, Bradley County emergency medical services ("EMS") personnel John Tyler and Matt Whittmaier arrived (Tyler Dep. Ex. 4; Ruth Aff. ¶ 6).  The parties disagree about the extent to which Ruth informed Tyler and Whittmaier about the situation.  According to Plaintiffs' rendition of Tyler's account, Ruth did not inform the EMS personnel about McCargo's statement he had been drinking and smoking drugs (Tyler Dep. at 167).  Ruth, however, maintains he did tell the EMS personnel about "the presence of marijuana and cocaine related to Mr. McCargo" (Ruth Aff. ¶ 9; Tyler Dep. at 160).[1]

While the EMS personnel spoke with McCargo, they noticed him stick his fingers down his throat and say he needed to throw up (Tyler Dep. at 119–20).  Additionally, Tyler testified he

---

[1]Plaintiffs point to further evidence in the record which, they contend, shows Ruth knew McCargo had been taking drugs, but did not tell Whittmaier and Tyler (Tyler Dep. at 115–17, 123); and that Ruth did not tell his superior, Lieutenant Anderson, about McCargo's medical condition, nor that the EMS personnel saw something white in McCargo's mouth, when Anderson arrived on the scene (Anderson Dep. at 75–76, 82).

thought he saw something white in McCargo's mouth (*id.* at 120–21). Whittmaier asked McCargo

if there was anything in his mouth, or if he had consumed any alcohol or drugs that day, but received

no response to either question (*id.* at 123–24), and Whittmaier, after inspecting McCargo's mouth,

found no foreign substance inside (*id.* at 121; Whittmaier Aff. ¶ 8).

The EMS personnel asked McCargo if he wanted to go to the hospital (Tyler Dep. at 137).

Tyler testified McCargo did not respond to this request (*id.*); however, Whittmaier maintained

McCargo refused to be transported to the hospital "by virtue of his refusal to accept" the offer of

transport (Whittmaier Aff. ¶¶ 13, 16–18). In any case, Plaintiffs allege a Bradley County policy

prohibited EMS personnel from transporting a patient to the hospital unless the person affirmatively

consented to be transported, regardless of how serious or obvious a medical condition that person

presented (Tyler Dep. at 86; Whittmaier Aff. ¶ 14). Because McCargo did not request transportation

to the hospital, and because they found no medical abnormalities other than McCargo's behavior

and apparent intoxication (Whittmaier Aff. ¶¶ 9, 12, 14), Tyler and Whittmaier left the scene after

Whittmaier concluded McCargo was intoxicated and should be released to the Cleveland Police

Department (*id.* ¶ 10).

Ruth arrested McCargo for public intoxication (Anderson Dep. Ex. 5) and placed him in the

back of his squad car for transportation to the Bradley County Justice Center (hereinafter "Bradley

County Jail") (Ruth Aff. ¶¶ 14, 19). Ruth maintains that during the ride to the jail, "Mr. McCargo's

demeanor did not change from the time Bradley County EMS turned Mr. McCargo over to me to

the time we arrived at the Bradley County Jail" (*id.* ¶ 20). The EMS personnel had described

McCargo as acting "calmly" during their evaluation of him (Tyler Dep. 106). However, when they

arrived at the jail, Ruth told staff there he had a "wild one," by which he "meant to convey that Mr.

McCargo was apparently intoxicated" (Ruth Aff. ¶ 21). Additionally, a detective for the Bradley County Sheriff's Office who conducted an internal investigation of the incident wrote that Ruth told her McCargo tried to kick the back glass of the patrol car, and that eyewitnesses at the scene watched McCargo trying to kick out the patrol car's windows (Tyler Dep. Ex. 7, at 6).

When Ruth arrived at the jail with McCargo under arrest, several Bradley County corrections officers came out to meet them. One officer, Defendant Connie Berger, noticed McCargo "rocking back and forth stating don't let the dogs get me" (Linder Dep. Ex. 5, at 7). Another, Marshall Hicks, wanted a medical evaluation of McCargo before McCargo could be processed into the jail (Hicks Aff. ¶ 7). Ruth apparently responded "that was fine, but that the EMT's [sic] at the scene had already cleared him" (*id.*). Officer Hicks called jail nurse Ben Linder to clear McCargo before the jail would accept him (*id.* ¶ 8). Again, the parties disagree here regarding how much information Linder had available. Ruth maintained "McCargo admitted that he had been smoking marijuana and cocaine to Bradley County corrections officers" (Ruth Aff. ¶ 24), while Linder testified he never knew McCargo had been drinking and smoking marijuana and crack, or that the EMS personnel saw something white in McCargo's mouth (Linder Dep. 70–71).

After completing his evaluation, Linder cleared McCargo to enter the jail, because he determined McCargo did not pose a danger to himself or others, but was merely intoxicated (*id.* at 84–85). Four Bradley County corrections officers took McCargo out of the car and into custody, and escorted him inside the building (*id.* at 95–96).

Although Linder testified McCargo was "relatively calm" when he arrived at the jail (*id.* at 79), while he was being moved into the jail, McCargo made repeated references to dogs being in the jail or being after him (*id.* at 96; Gruver Aff. ¶ 10). Once they were inside the jail, officers

attempted to put McCargo into a holding cell, but McCargo "kept his body tense" and resisted, apparently because he thought vicious dogs were in the cell (Linder Dep. Ex. 5, at 6–8). Because of his resistance, "for Mr. McCargo's safety," the officers agreed they should place McCargo in a restraint chair (*id.* at 8). McCargo continued his resistance while the officers attempted to put him in the restraint chair (*id.*). Because of McCargo's resistance, Defendant Michael Cooper applied a taser to involuntarily relax his muscles and get him to sit in the chair. According to Plaintiffs' interpretation, Cooper applied the taser directly to McCargo's throat, resulting in burns to his neck (Cooper Aff. ¶ 15; Tucker Dep. 75–76 & Ex. 8). According to Defendants, Cooper applied the taser "around the neck/shoulder area" (Linder Dep. Ex. 5, at 8; *see also* Cooper Aff. ¶ 15 (Cooper "applied a single stun to Mr. McCargo to his neck/shoulder area" not exceeding five seconds)). McCargo then sat in the restraint chair from 5:30 p.m. to 9:00 p.m. without further resistance, though he did repeat his references to dogs (Linder Dep. Ex. 5, at 8).

While McCargo sat in the restraint chair, Bradley County Jail officers checked on his status at periodic intervals (*id.* Ex. 5). Officers stated they heard Nurse Linder ask McCargo if he was feeling better, and McCargo nodded affirmatively (*id.* at 8–9). During this time, the officers reported McCargo as being calm and quiet (*id.*). Nurse Linder performed one last evaluation of McCargo at 7:30 p.m., then left the jail for the evening (Linder Dep. at 160–61).

At approximately 9:00 p.m., Defendants Tina Cooper and Scotty McMinn released McCargo from the restraint chair and placed him in a cell (*id.* Ex. 5, at 9). Shortly thereafter, McCargo "started to shake and cough up what appeared to be blood" and became unconscious (*id.*). Officers called for EMS personnel, who put him on a stretcher and transported him to the hospital (*id.*). At the hospital, the attending physician diagnosed McCargo with respiratory and cardiac failure and

5

multi-organ failure resulting from cocaine use (Linder Dep. Ex. 5, at 10).  Despite treatment from the hospital, McCargo entered a coma from which he never recovered, and died eleven months later (Compl. ¶ 53).

Suing under 42 U.S.C. § 1983, Plaintiffs brought a bevy of claims.  Their complaint alleged a Fourth Amendment violation because the officers used excessive force, a Fourteenth Amendment violation in the officers' failure to provide adequate medical care, violations of McCargo's substantive due process rights, conspiracy to violate McCargo's civil rights in violation of 42 U.S.C. § 1985, First Amendment and Fourteenth Amendment privacy violations, supervisory liability against superior officers in Bradley County and the Cleveland Police Department, *Monell* municipal liability claims against Bradley County and the City of Cleveland stemming from their alleged failure to properly train their employees as to the use of force and medical care for emotionally disturbed persons, and failure to intercede under § 1983.  They also alleged related state-law tort claims for loss of consortium, negligence, negligent training and supervision, assault and battery, and malpractice/negligence.

Plaintiffs originally filed their complaint in the Circuit Court of Bradley County, Tennessee (Court File No. 1 Ex. 1).  The Cleveland Defendants removed the case to this Court on March 13, 2007 (Court File No. 1), and the Bradley County Defendants joined in the removal on March 19, 2007 (Court File No. 2).  The parties timely filed their motions for summary judgment, responses, and replies, all of which the Court now considers.


## II.     STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials

6

on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). That is, the moving party must provide the grounds upon which it seeks summary judgment, but does not need to provide affidavits or other materials to negate the non-moving party's claims. *Celotex*, 477 U.S. at 323. The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis*, *Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, and must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.    DISCUSSION

### A.    Standing

Both sets of Defendants move first for summary judgment on standing grounds, arguing each of the individual Plaintiffs lacks standing to bring both their federal and state claims. Plaintiffs

7

respond that Tennessee law establishes their standing as to both sets of claims.

To bring an action in federal court, plaintiffs must prove (1) they have suffered a concrete, particularized injury (2) fairly caused by the allegedly unlawful actions of the defendants (3) which a favorable court decision would likely redress. *Allen v. Wright*, 468 U.S. 737, 751 (1984). Defendants here dispute the first part of the standing inquiry, arguing because McCargo is no longer alive, his family members who have brought this action lack a personalized injury which this Court could redress. There appears to be no dispute regarding the last two parts.

In § 1983 cases, the cause of action is entirely personal to the direct victim of the alleged constitutional tort. *Jaco v. Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984). However, the Supreme Court has recognized federal law is unclear on survival of § 1983 actions upon the death of an allegedly injured individual. *Robertson v. Wegmann*, 436 U.S. 584, 587, 589 (1978). Accordingly, this Court must use the survivorship rule for civil actions of the state where the action is brought. 42 U.S.C. § 1988(a); *Jaco*, 739 F.2d at 241.

In Tennessee, no "right of action . . . based on the wrongful act or omission of another . . . be abated by the death of the party wronged; but the right of action shall pass in like manner as the right of action described in § 20-5-106." Tenn. Code Ann. § 20-5-102. The Tennessee wrongful death statute provides:

> The right of action which a person, who dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another, would have had against the wrongdoer, in case death had not ensued, shall not abate or be extinguished by the person's death but shall pass to the person's surviving spouse and, in case there is no surviving spouse, to the person's children or next of kin; or to the person's personal representative, for the benefit of the person's surviving spouse or next of kin . . . .

*Id.* § 20-5-106(a). Under this statute, "[i]f there is no surviving spouse the children of the deceased

8

have priority to bring the action as the next of kin." *Foster v. Jeffers*, 813 S.W.2d 449, 451 (Tenn. Ct. App. 1991).

Here, McCargo's mother, Eunice McCargo Spears, has testified she was the personal representative of McCargo's estate, making decisions for him from the time he entered the hospital and continuing after his death (Spears Dep. at 54). She did not directly answer the question of whether she went to a court to be appointed McCargo's personal representative, and Plaintiffs have pointed to no evidence a Tennessee court did, in fact, appoint her as personal representative, so it is unclear whether Spears meant this in the legal sense of one who is appointed to administer the legal disposition of a decedent's estate, or in the lay sense of someone who attends to the affairs of the recently deceased. However, on summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party. Since Spears has testified she was McCargo's personal representative and alleged the same (Compl. ¶ 7), the Court takes as true, for the purpose of deciding this motion, that Spears functioned as McCargo's personal representative.

The Bradley County Defendants unpersuasively argue that because no estate appears to have been established in McCargo's name, Eunice McCargo Spears could not qualify as his personal representative. Yet merely because an individual dies intestate (Spears Dep. at 54) does not mean that person lacks an estate; the individual still possessed chattels and perhaps real property before death. Those and other assets comprise a decedent's estate, which would pass to the decedent's heirs in the order prescribed by the state statute of intestate succession, Tenn. Code Ann. §§ 31-2-101 to -110, or escheat to the state if no heirs remain, *id.* §§ 31-6-101 to -122. And a Tennessee chancery court can still appoint a personal representative to dispose of an intestate estate. *Id.* § 30-1-301. In light of the foregoing, Eunice McCargo Spears has standing to pursue this action as the

putative personal representative of McCargo's estate. Christie McCargo, as minor daughter of the decedent who is represented by her mother (McCargo Dep. at 19), also has standing under the reasoning in *Foster. See Jaco*, 739 F.2d at 245.

The Court turns next to the remaining Plaintiffs, Clay McCargo Spears (the decedent's father) and Madeline McCargo (the decedent's sister). These Plaintiffs have asserted state law claims for wrongful death (due to Defendants' alleged negligence and assault and battery) and loss of consortium.

Tennessee law provides a decedent's parents and siblings have standing to assert loss of consortium claims. *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 601 (Tenn. 1999) (recognizing parental consortium and also holding "[t]he age of the child does not, in and of itself, preclude consideration of parental consortium damages"); *Hancock v. Chattanooga-Hamilton County Hosp. Auth.*, 54 S.W.3d 234, 236 (Tenn. 2001) (interpreting Tenn. Code Ann. § 20-5-113 to include filial consortium damages). Further, this Court has held it may hear a state law claim alongside a § 1983 claim if both arose from the same set of facts. *Wright v. Depew*, 2008 WL 3896125, at *3 (E.D. Tenn. Aug. 19, 2008) (citing *Kinzer v. Metro. Gov't of Nashville*, 451 F. Supp. 2d 931, 947 (M.D. Tenn. 2006)). As for wrongful death actions, Tennessee provides "survivors of the deceased may recover damages for their losses suffered as a result of the death as well as damages sustained by the deceased from the time of injury to the time of death." *Jordan*, 984 S.W.2d at 598 (citing Tenn. Code Ann. § 20-5-113). Loss of consortium is "one component" of a wrongful death action. *Kline* ex rel. *Kline v. Eyrich*, 69 S.W.3d 197, 207–08 (Tenn. 2002).

Here, the state claims brought by McCargo's relatives asserting loss of consortium and other wrongful death-related torts arose from the same set of facts giving rise to the § 1983 claim. Both

Clay McCargo and Madeline McCargo, asserting these state law claims, have standing under the above-described law as father and sister, respectively, of the decedent. Accordingly, the Court concludes all the named Plaintiffs have standing to bring this action, and summary judgment is therefore precluded on this ground.

### B.    Qualified Immunity

Both the Bradley County Defendants and the Cleveland Defendants invoke the doctrine of qualified immunity to bar this suit from going forward. Plaintiffs respond by introducing evidence which, they claim, demonstrates Defendants are not entitled to qualified immunity.

Government officials performing discretionary functions may invoke qualified immunity as an affirmative defense "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). There are two parts to the qualified immunity analysis: (1) whether, viewing the facts in the light most favorable to the plaintiff, there was a violation of the plaintiff's constitutional right(s), and (2) whether the right was clearly established to a reasonable person, such that its violation would be objectively unreasonable. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).[2] The district court may begin its analysis with either of the two parts. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). If either of the prongs is answered in the negative, the individual officer is entitled to qualified immunity. *See Saucier*, 533 U.S. at 201.

Once a defendant comes forward with facts suggesting he acted within the scope of his

---

[2]Occasionally, to "increase the clarity of the analysis," the Sixth Circuit treats the "objectively unreasonable" requirement as a third, separate prong. *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008).

discretionary authority, the burden shifts to the plaintiff to establish the defendant's conduct violated a clearly established constitutional right which a reasonable person would have known. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

### 1. Was there a constitutional violation?

Plaintiffs have asserted two possible violations of McCargo's constitutional rights: (1) excessive force during his detention, allegedly in violation of the Fourth Amendment; and (2) deliberate indifference to his medical needs and failure to provide adequate medical care, allegedly in violation of the Fourteenth Amendment.[3] The Court examines each in turn.

### a. Excessive force

"The standard under which a pretrial detainee's claim of excessive force is evaluated lies in the murky area between the Fourth and Eighth Amendments." *Gantt v. Akron Corr. Facility*, 1996 WL 6530, at *2 (6th Cir. Jan. 8, 1996). However, the Fourth Amendment's general protections apply so long as an arrestee is in the custody of arresting officers, *Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002), and "at the very least, [the Sixth Circuit has held] that 'the Fourteenth Amendment . . . Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment,'" *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008) (quoting *Phelps*, 286 F.3d at 300)). "The Fourteenth Amendment is the source of a pretrial detainee's excessive force claim because when a plaintiff is not in a situation where his rights are governed by the particular

_____

[3]Plaintiffs' complaint also asserted violations of McCargo's substantive due process rights (Compl. ¶¶ 93–95). However, "'[D]eliberate indifference' to the serious medical needs of pretrial detainees normally constitutes a substantive due process violation." *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008). The Court will subsume Plaintiffs' substantive due process arguments into its analysis of their excessive force and deliberate indifference claims, as both involve elements of Fourteenth Amendment substantive due process.

12

provisions of the Fourth or Eighth Amendments, the more generally applicable Due Process Clause of the Fourteenth Amendment provides the individual with protection against physical abuse by officials." *Id.* at 680–81.[4] Here, the Fourth Amendment's reasonableness standard would apply to McCargo only during the time he was a "free person" until Ruth arrested him. *See id.* at 680. But as for the events in the Bradley County jail, the Due Process Clause of the Fourteenth Amendment would apply to McCargo as a pretrial detainee who was no longer in the custody of the arresting officer. *See id.* at 681; *Phelps*, 286 F.3d at 300; *see also Leary v. Livingston County*, 528 F.3d 438, 443 (6th Cir. 2008); *Johnson v. City of Cincinnati*, 310 F.3d 484, 492 (6th Cir. 2002) (holding a Fourth Amendment seizure "continues throughout the time the person remains in the custody of the arresting officers," but declining to address whether a seizure extends temporally further); *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008) ("The district court erred in applying the Fourth Amendment" to the excessive force claims of an arrestee whom police were transporting).

As the *Lanman* court noted, "[t]his is not a purely academic question as the standards of liability vary significantly according to which amendment applies." *Id.* at 679–80. "A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the 'objective reasonableness' test of [*Graham v. Connor*, 490 U.S. 386 (1989)] . . . ." *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001). The test under the

---

[4]While the Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386 (1989), prescribes the contours of the Fourth Amendment's reasonableness standard, the Supreme Court later clarified that holding by explaining *Graham* "does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, *Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *Lanman*, 529 F.3d at 680.

Fourteenth Amendment is whether the alleged conduct "shocks the conscience," which depends on the factual circumstances of each case. *Id.* (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 851–53 (1998)). The Supreme Court has suggested decisions made "in haste," in circumstances "calling for fast action," will not rise to the level of shocking the conscience unless they are made "maliciously and sadistically for the very purpose of causing harm." *Lewis*, 523 U.S. at 853. However, where government actors

> are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action . . . their actions will be deemed conscience-shocking if they were taken with deliberate indifference towards the plaintiff's federally protected rights. In contradistinction, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation . . . public servants' reflexive actions shock the conscience only if they involved force employed maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline.

*Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (internal citations, quotations, and brackets omitted).

This Court should analyze the Defendants individually, or at least by category based upon their roles in the February 24 incident, to establish whether each of them could have violated McCargo's constitutional rights. *See Lanman*, 529 F.3d at 684.

### i.    Officer Matthew Ruth and Chief of Police Wes Snyder

The extent of Plaintiffs' argument that Officer Ruth and Chief Snyder are not entitled to qualified immunity on the excessive force claim is to argue that because their conduct (particularly Officer Ruth's) rose to the level of deliberate indifference, and because the deliberate indifference standard is more stringent than the Fourth Amendment objective reasonableness standard, there is a genuine issue regarding whether the Cleveland officers' actions were objectively unreasonable.

14

In police seizure situations, the Court must judge the reasonableness of a particular use of force by an objective standard. *Graham*, 490 U.S. at 396. This "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Sixth Circuit has held in general, the use of non-lethal force against a volatile suspect does not constitute excessive force. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 508 (6th Cir. 2002); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992) (holding an officer's "use of non-lethal force to subdue a potentially homicidal individual" did not violate clearly established law).

Here, Officer Ruth approached McCargo after he had been called to respond to reports there was a man lying in the roadway. Based on this report, and on McCargo's behavior while being questioned, Officer Ruth concluded McCargo was intoxicated (Ruth Aff. ¶¶ 4–5). McCargo's statement to Ruth he was running from dogs may also have given Ruth some indication McCargo was mentally disturbed. Officer Ruth arrested McCargo for intoxication (*id.* ¶ 12), and Plaintiffs do not dispute he had probable cause to do so. Before transporting McCargo, Officer Ruth double-locked the handcuffs on McCargo so they would not tighten (*id.*) and rolled down the window in his squad car to ensure McCargo's comfort (*id.* ¶ 14). The above picture is not consistent with that of an officer who used excessive force. Rather, Officer Ruth appears to have used the force necessary to arrest an individual whom Officer Ruth had probable cause to believe was intoxicated, without causing injury to McCargo and, in fact, attempting to give him a measure of comfort. Moreover, Plaintiffs cite no authority for their proposition that the deliberate indifference standard is more stringent than the objective reasonableness standard, leading to a denial of qualified immunity.

15

Instead, Officer Ruth's actions were reasonable and not greater than necessary under the circumstances to effectuate the arrest of a publicly-intoxicated individual.

Therefore, the Court finds Officer Ruth did not commit a constitutional violation vis-à-vis McCargo's right to be free from excessive force. Additionally, Plaintiffs have not put forth evidence showing Chief Snyder "condoned, encouraged, or knowingly acquiesced in the alleged unconstitutional misconduct," *Mills v. City of Barbourville*, 389 F.3d 568, 580 (6th Cir. 2004), as is required to show supervisory liability in a § 1983 action. Thus, both Officer Ruth and Chief Snyder are entitled to qualified immunity on Plaintiffs' excessive force claim.

### ii.     Bradley County Officer Michael Cooper

The Court must analyze Officer Cooper separately from other officers at the Bradley County Jail because only he is alleged to have applied a taser to McCargo. Plaintiffs maintain Officer Cooper applied the taser to McCargo when he was already at least partially restrained in the restraint chair, creating a genuine issue as to whether the taser's use was excessive (Court File No. 136, at 24–26). The Bradley County Defendants argue Officer Cooper applied the taser in accordance with Bradley County policy on its use, that he applied it with minimal pressure for a limited duration, and that the taser's use was necessary to secure the safety of everyone (including McCargo) and the jail's security (Court File No. 126, at 30).

Courts should be highly deferential to prison officials' efforts to ensure "the central objective of prison administration, safeguarding institutional security," and to "preserve internal order and discipline." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). That is, "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel . . . . Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee

16

. . . the practice must be evaluated" in light of the central objective of maintaining prison security. *Id.* Importantly, the Supreme Court made no distinction between the measures taken to control convicted inmates and those used for pretrial detainees. *Id.* n.28.

In applying this standard to the use of tasers on detainees, courts have focused on detainees' conduct when the taser was applied, the frequency and force with which it was applied, and the overall security needs of the institution. For instance, one court found a taser's use objectively reasonable where a pretrial detainee was intoxicated, struggled against officers, and exhibited considerable strength. The officer believed other methods of regaining control would not have been as safe or effective as the taser, and the officer warned the detainee to stop resisting before applying the taser. *Price v. Austin Police Dep't*, 2007 WL 1577667, at *12 (W.D. Tex. May 31, 2007). Another court upheld a taser's use where a detainee struggled against officers and bit an officer's hand, banged on his cell door, and refused a command to lie down. The court concluded that "considering [the decedent's] agitation when officers entered his cell to draw blood along with his demonstration of an altered mental state and earlier aggression that included biting an officer, an officer could have believed that [the taser's use] was reasonably necessary." *Burkett v. Alachua County*, 250 F. App'x 950, 953 (11th Cir. 2007). However, the Sixth Circuit has held repeated use of a taser while a suspect was already pinned down and under control amounted to excessive force under the Fourth Amendment because "[t]he gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional." *Roberts v. Stricklen*, 240 F. App'x 675, 677 (6th Cir. 2007) (quoting *Bultema v. Benzie County*, 146 F. App'x 28, 35 (6th Cir. 2005)). The Sixth Circuit has also upheld the denial of qualified immunity where officers applied a taser five times in less than two minutes to a suspect who was lying prone and face-down in a pool of water

17

because the officers should have known that "gratuitous or excessive use of a taser would violate a clearly established constitutional right." *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008) (citing *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993)).

Here, viewing the evidence in the light most favorable to Plaintiffs, Officer Cooper applied the taser once in a five-second burst to an area somewhere on McCargo's neck (Elkins Aff. Ex. A), though Plaintiffs contend Officer Cooper applied it "directly to his throat" (Court File No. 136, at 24). At the time, McCargo was physically resisting officers' efforts to place him in a restraint chair (Cooper Aff. ¶¶ 13–15). The parties dispute whether McCargo was already partially restrained at the time Officer Cooper applied the taser (*compare id.* ¶ 15 *with* Elkins Aff. Ex. A). It is undisputed, however, that McCargo put up a significant level of physical resistance, a fact which numerous Bradley County Jail officers recorded, including that McCargo "tried to get away from the officers by using his feet to push off against the bench and the wall," he "continued to resist tensing his body by not bending at the hipps [sic]," and "the whole time while being placed in the restraint chair he was resisting and began yelling and spitting while he yelled" (Linder Dep. Ex. 5).

In this situation, the Court cannot conclude Officer Cooper's use of the taser was gratuitous or excessive so as to render it unconstitutional. By physically resisting officers to the extent he did, the officers could reasonably have believed McCargo posed a threat to them, other inmates and jail staff, and himself. Officer Cooper applied the taser only once, in a five-second burst, in a manner consistent with his training on the device's use (Cooper Aff. ¶ 15), and Plaintiffs do not dispute the adequacy of Cooper's training nor whether he applied the taser in a manner consistent with it. While McCargo may have suffered burn marks to his neck from the taser's application, and this was certainly an "identifiable manifestation of injury" which rose above a de minimis level, *Leary*, 528

18

F.3d at 443, it was an unfortunate but expected result of the taser's application, and one which does not rise to the level of the "shocks the conscience" standard necessary to prevail on this claim. In short, Officer Cooper's use of the taser was not gratuitous or excessive. It was a calculated use of force, like that in *Price* and *Burkett*, designed to subdue, but not punish or inflict unnecessary harm upon, McCargo due to his continued resistance.

The dispute over whether McCargo was already partially restrained when Officer Cooper applied the taser is immaterial in light of McCargo's continued, aggressive resistance even if he *was* restrained. Even viewing the evidence in the light most favorable to Plaintiffs, McCargo put up quite a fight—one which justified a reasonable officer in using the minimum level of force necessary to protect persons in the jail and maintain institutional security. The Court finds that one application of a taser to a physically-resistant detainee met that standard in these circumstances.

For these reasons, Officer Cooper's conduct did not meet the shocks the conscience standard necessary for Plaintiffs to succeed on their Fourteenth Amendment claim. There being no constitutional violation, the Court will grant qualified immunity to Officer Cooper on that claim.

### iii. Other Bradley County Officers

The gravamen of Plaintiffs' argument in responding to these officers' invocation of qualified immunity is that they engaged in excessive force by failing to timely release McCargo from the restraint chair (Court File No. 135, at 26–29). Again, because McCargo was already well ensconced in the Bradley County Jail at the time these officers had any contact with him, the Court evaluates this claim under the Fourteenth Amendment shocks the conscience standard, rather than the Fourth Amendment excessive force standard applicable to those the police have seized.

Bradley County Jail's policy on use of restraints provides: "The restraint chair will only be

19

used when all other lesser forms of restraints have proven to be ineffective and to prevent injury to the inmate, others, or damage to property. The inmate will remain in restraints until no further violent behavior is noted" (Linder Dep. Ex. 2). The policy further provides: "Once the inmate has complied, he/she will be removed from the restraint chair" (*id.*). A note to this provision specifies "[t]he maximum confinement time will be determined by the Shift Lieutenant and the Medical Staff, but should not exceed four hours unless absolutely necessary" (*id.*). The policy further requires jail staff to observe the restrained inmate every ten to fifteen minutes, and to document their observations (*id.*).

The restraint chair's manufacturer advises "[d]etainees should not be left in the Emergency Restraint Chair for more than two hours," and that the time limit "may be extended, but only under direct medical supervision" (Tucker Dep. Ex. 21). Plaintiffs have submitted evidence Nurse Linder checked on McCargo at 7:30 p.m., approximately two hours after McCargo entered the restraint chair, but left the jail afterwards and no other jail personnel checked on McCargo (Linder Dep. at 160–61). According to Linder, this lack of staffing was customary at the jail because corrections officers knew how to respond and whom to call in case of an emergency (*id.* at 161). Plaintiffs have also introduced evidence, including a number of statements from jail officers, showing McCargo calmed down and became compliant after being seated in the restraint chair (Linder Dep. at 157 & Ex. 5). Plaintiffs contend this shows the Bradley County Defendants violated official policy because they did not release McCargo from the restraint chair until his "time was up" at 9:00 p.m.

To be sure, McCargo experienced a significant restraint on his liberty, and his physical comfort, while confined to the restraint chair for approximately four hours. The Court is unpersuaded, though, that McCargo's restraint rose to the level required under the shocks the

20

conscience test—namely, that his confinement was imposed maliciously and sadistically, for the very purpose of causing harm. The officers did not force McCargo to continuously stand or kneel for four hours, which would have imposed a much higher, sustained degree of discomfort. While he was in the restraint chair, Nurse Linder regularly observed him until 7:30 p.m., and the other corrections officers regularly monitored him after Nurse Linder left (Linder Dep. Ex. 5 (statements of Bradley County Jail officers)). It is true McCargo remained in the chair for nearly four hours notwithstanding the evidence he was acting calmly and was compliant. However, given McCargo's behavior immediately prior to entering the restraint chair, which included aggressive physical resistance, yelling, and spitting—which Plaintiffs do not dispute—a reasonable officer could have concluded an extended period in the chair was necessary to ensure McCargo would not act up again and pose a threat to institutional security. The jail's policy on use of restraints authorizes their use, among other reasons, "as a prevention against self-injury and injury to others or property damage" (Linder Dep. Ex. 2). Certainly, the officers had a reasonable belief McCargo could engage in such behavior given his previous resistance, and that other means of restraint such as handcuffs or leg restraints would have been ineffective or unsafe. There was a legitimate need for restraint for officers to prevent McCargo from harming himself and others. *See Slaughter v. Dooly County*, 2007 WL 2908648, at *10 (M.D. Ga. Sept. 28, 2007) (approving the plaintiff's confinement in a restraint chair for ten hours where she "continued to strike the cell with her hands and feet and demonstrated a risk of self harm"). Finally, to the extent there is a conflict between the Bradley County policy on allowable length in the restraint chair (not more than four hours) and the manufacturer's policy (not more than two hours without direct medical supervision), the Court finds any negative effect this had on McCargo was de minimis, at most. Even in the hour and a half between Nurse Linder's

21

departure and McCargo's release from the restraint chair, jail officers continually monitored him (Linder Dep. Ex. 5). They were attentive to his medical needs and comfort, inquiring of his condition while he was sitting in the chair, and offering him a blanket and a sack lunch after his release (*id.* (statement of Officer McMinn)).

On these facts, even if McCargo stayed in the chair an hour and a half longer than he should have, the Court does not conclude any such untimely release would shock the conscience under the exacting Fourteenth Amendment standard at play, especially given the jail officers' need to maintain institutional security in view of McCargo's earlier, physically resistant behavior. Accordingly, the Court finds the Bradley County Jail individual Defendants did not commit a constitutional violation as to McCargo, and thus will grant them qualified immunity.

**b.    Deliberate indifference; inadequate medical care**

Pretrial detainees have a Fourteenth Amendment right to adequate medical care which is comparable, though not identical, to prisoners' Eighth Amendment rights. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005). To establish a violation under § 1983 of the right to adequate medical care, a plaintiff must show defendants acted with "deliberate indifference to serious medical needs." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

"Deliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [a plaintiff's] health and safety." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 835–37 (1994)). In other words, defendants' behavior must rise above even gross negligence and must instead constitute recklessness in a criminal sense. *Farmer*, 511 U.S. at 837. "There are two parts to the claim, one objective, one

22

subjective. For the objective component, the detainee must demonstrate the existence of a sufficiently serious medical need. For the subjective component, the detainee must demonstrate that the defendant possessed a sufficiently culpable state of mind in denying medical care." *Carter*, 408 F.3d at 311 (internal citations and quotations omitted).

The "culpable state of mind" part of the subjective component requires that "[t]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003) (quoting *Farmer*, 511 U.S. at 837). Then, the official must actively disregard the risk. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). "Because government officials do not readily admit the subjective component of this test, it may be 'demonstrat[ed] in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

As for the objective component, "where a plaintiff's claims arise from an injury so obvious that even a layperson would easily recognize the necessity for a doctor's attention[,] it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Phillips v. Roane County*, 534 F.3d 531, 539–40 (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899–900 (6th Cir. 2004))

23

(internal punctuation omitted).

The Court must analyze the subjective component of a deliberate indifference claim as to each officer individually. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). For ease of analysis, the Court has divided the individual Defendants into categories based upon the roles they played during the events of February 24, 2006, and will analyze both the objective and subjective components as to each set of Defendants. The Court analyzes the objective component separately because there is evidence suggesting McCargo presented different symptoms during his initial encounter with Officer Ruth than he did when he arrived at the Bradley County Jail.

### i.      Officer Matthew Ruth

When Ruth arrived on the scene, he already possessed information about McCargo's behavior—namely, the Cleveland police dispatcher's report that McCargo was "running up and down the street" and was "acting like he has bugs crawling on him and in his pockets and thinks they are coming to get him" (Anderson Dep. Ex. 1). After Ruth exited his vehicle and approached McCargo, he smelled a "very strong odor of burnt marijuana" (*id.* Ex. 4). According to Ruth's own account, "McCargo stated that he had been drinking and smoking marijuana and crack cocaine" and "he was running from a dog and the Police" (*id.*). In his affidavit, Ruth does not dispute these facts, adding only that McCargo appeared intoxicated when Ruth first encountered him (Ruth Aff. ¶ 5).

As the Cleveland Defendants point out in their reply brief (Court File No. 139, at 6), however, one important fact remains unclear: whether Ruth knew of EMS personnel's possible discovery of a white substance in McCargo's mouth. While one of the EMS responders, John Tyler, testified he may have seen a white substance in McCargo's mouth (Tyler Dep. at 120–21), the record does not establish he or anyone else ever conveyed this information to Ruth. Certainly, Ruth's

24

affidavit does not state he was aware of such a substance, or that McCargo may have swallowed something; however, Plaintiffs point to no other testimony of any other witness consistent with such a claim.

The Cleveland Defendants rely heavily on *Weaver* to contend Ruth's conduct did not meet the objective prong for deliberate indifference. In *Weaver*, the decedent was an arrestee who appeared to have a substance in his mouth. After officers tried to place their fingers in the arrestee's mouth, while telling him not to swallow the substance, the arrestee appeared to swallow it. The officers requested paramedics arriving at the police station to examine the decedent for "possible drug reaction and/or overdose," though he refused treatment and denied ingesting drugs. 340 F.3d at 402–03. After the arrestee died from what was later diagnosed as a cocaine overdose, *id.* at 405, his estate sued and the officers claimed qualified immunity. The Sixth Circuit, in remanding to grant summary judgment based on qualified immunity, held the plaintiff's argument that the officers "believed" or "should have known" the decedent had swallowed drugs did not satisfy the objective prong of the deliberate indifference claim because it was "equally plausible that the Officers 'believed' that [the decedent] had tossed out the drugs as he fled from the police." *Id.* at 411. The court added that since the officers did not see or have knowledge the decedent ingested cocaine, he repeatedly denied swallowing drugs, and he refused transportation to a hospital, the officers could not have acted with deliberate indifference because the decedent did not exhibit a sufficiently serious medical condition. *See id.*

*Weaver* itself relied on the Sixth Circuit's earlier holding in *Watkins*, which also addressed qualified immunity after a detainee's death in custody due to a cocaine overdose. When police searched the decedent's house before arresting him, they found crumbs of crack cocaine sprinkled

around, and saw the decedent licking his lips, with a pink, foamy drool emanating from his mouth. The officers inquired if the decedent had swallowed drugs and informed him of the dire consequences of doing so, but the decedent consistently denied he had and also declined medical treatment. 273 F.3d at 684. In upholding the grant of summary judgment on qualified immunity grounds, the Sixth Circuit held "it is not enough for plaintiff to demonstrate a question of fact whether the police officers or sheriff's deputies *should have* known that [the decedent] had swallowed drugs." *Id.* at 686 (emphasis in original). "Because the officers did not see the suspect ingest any cocaine, the court found that there was insufficient evidence to lead a rational trier of fact to conclude that the officers or jailers knew the suspect needed medical attention for drug ingestion." *Weaver*, 340 F.3d at 411 (citing *Watkins*, 273 F.3d at 686).

The evidence submitted by Plaintiffs here shows a critical factor which distinguishes the instant case from *Watkins* and *Weaver*. The Cleveland Police Department has a written policy detailing police procedures regarding in-custody death syndrome, described as "sudden, unexplained deaths involving suspects who were taken into custody after violent confrontations with officers" (Bronze Dep. Ex. 14). The policy goes on to describe a certain condition observed in some in-custody death situations:

> **Excited delirium:** Also known as cocaine psychosis. Cocaine (or other stimulant) induces a high state of anxiety. Which results in a rapid onset of paranoia, bizarre behavior, extraordinary strength, hallucinations, disrobing, high temperature and aggressive, violent behavior.

(*Id.*). The policy further directs that "[i]n the event officers come in contact with a subject or subjects who display actions synonymous with excited delirium, the officers should use extreme caution" (*id.*).

As described above, McCargo was lying in the middle of the roadway, thought bugs or police

(or both) were coming after him, seemed to think bugs were crawling over him, and thought a dog was chasing him even though none was in sight. McCargo had admitted to Officer Ruth he had smoked crack cocaine earlier that day; after Ruth placed him in the patrol car, but before they drove away, McCargo was violently kicking at the cruiser's windows. Under the policy's language, then, McCargo demonstrated at least some, if not all, of the "classic signs" of excited delirium or cocaine psychosis. *See Bertl v. City of Westland*, 2009 WL 247907, at *5 (6th Cir. Feb. 2, 2009) (holding observations by lay people of a detainee lying face down and unresponsive, and exhibiting symptoms of delirium tremens, demonstrated the existence of a sufficiently serious medical need); *Carter*, 408 F.3d at 312 (holding a detainee's complaints of chest pain and trouble breathing, the fact she was behind in taking her heart medication, and that she was lying on the floor were "classic signs" of a heart attack that a layperson could be expected to recognize); *Blackmore*, 390 F.3d at 899–900 (holding vomiting and complaints of sharp and severe stomach pains made over a two-day period were "classic signs of appendicitis").

It is not clear whether Ruth himself was aware of the in-custody death syndrome policy or its definition of excited delirium/cocaine psychosis. However, at least one of his fellow officers has testified he received training on the policy, and thought Ruth would have as well (Bronze Dep. at 23–24, 111). Viewing the evidence in the light most favorable to the Plaintiffs, it is reasonable to conclude that as a member of Cleveland's police force, Ruth would have received training which included the definition of excited delirium/cocaine psychosis and the symptoms consistent with it.

Plaintiffs argue that "[g]iven Mr. McCargo's hallucinations, paranoia, bizarre behavior, prior drug use, and the possibility that he swallowed an unknown amount of crack cocaine, it was obvious that Mr. McCargo was suffering from a serious medical condition, namely excited delirium" (Court

File No. 135, at 14).  While the Court cannot agree it was "obvious" McCargo was suffering from excited delirium, the Court does conclude it was at least *possible*.  The Court sees at least three alternatives: McCargo was severely emotionally disturbed and acting out, but was not under the influence of drugs; McCargo was behaving bizarrely because he was under the influence of alcohol, marijuana, and crack, but not in harmful amounts; or McCargo had, in fact, ingested a dangerous amount of crack.  While the former two alternatives are conceivable, the Court concludes that the thought would at least have crossed a reasonable layperson's mind that McCargo was exhibiting symptoms consistent with the latter, and the lay person would have sought the help of medical personnel.  This should be all the more likely in the case of a police officer who, though not medically trained, often encounters individuals under the influence of substances or behaving strangely.  In this situation, even if Ruth was unaware of any white substance which may have been in McCargo's mouth, McCargo nevertheless exhibited other signs (the smell of marijuana, hallucinations, and behavior possibly consistent with cocaine psychosis) from which the thought of a possible drug overdose would have at least registered to a reasonable officer, especially given McCargo's admission he had been smoking crack cocaine earlier that day.  There is a material issue of fact, which is reserved to a jury to decide, whether Ruth knew McCargo was suffering from drug hallucinations, stemming from a cocaine overdose, which amounted to excited delirium in view of McCargo's other symptoms.  Accordingly, the evidence viewed most favorably to Plaintiffs shows they have met the objective prong of the deliberate indifference test, at least on summary judgment.

The analysis does not end there, however, as the Plaintiffs must demonstrate a genuine issue both that Ruth was aware of facts from which an inference of risk to McCargo's health could be drawn, and that Ruth in fact drew that inference and disregarded the risk.  *Weaver*, 340 F.3d at 410;

28

*Comstock*, 273 F.3d at 703.

As the Court described above, Ruth had knowledge of McCargo's abnormal behavior both before and during his encounter with McCargo. McCargo expressly told him of his recent drug and alcohol use. McCargo continuously exhibited symptoms consistent with excited delirium or cocaine psychosis as described in the Cleveland Police Department's policy on in-custody death syndrome. That policy provided that "[i]f no breathing difficulties are evident, but other injuries or drug use are present, then the officer should transport the subject to the ER per department guidelines" (Bronze Dep. Ex. 14). Even after witnessing McCargo exhibit most of the symptoms of excited delirium/cocaine psychosis, Ruth did not transport McCargo to the emergency room, but arrested him and took him to the Bradley County jail.[5] Ruth watched McCargo behave violently as he started kicking the window of the squad car (Tyler Dep. Ex. 7, at 6), and informed jail staff he had a "wild one" (Ruth Aff. ¶ 21), yet according to Plaintiffs' evidence, never told the jail nurse about this or McCargo's admission to drug use. Based on the totality of these circumstances, the Court concludes a reasonable jury could find Ruth was aware of facts from which he drew an inference of a risk to McCargo's health.

The Court also concludes there is a genuine issue of fact as to whether Ruth had a sufficiently culpable state of mind in denying McCargo adequate medical care. One of the central

---

[5]There was a competing policy in effect at the time, written by Defendant Snyder in his capacity as Cleveland's police chief, which prevented officers from transporting "anyone in a police vehicle for medical services" (Court File No. 135 Ex. 6). However, the same policy permits transportation in an ambulance for anyone who "shows signs of physical trauma" (*id.*). The Court believes there is a credibility question for the trier of fact as to whether the decision not to order an ambulance to transport McCargo to the hospital was reasonable, and as to the role McCargo's repeated denials of offers for medical treatment played in the decision. The Court addresses this issue in further detail in its discussion below of the City of Cleveland's municipal liability.

29

factual disputes about Ruth's conduct concerns the extent to which he informed trained medical personnel about his observations of McCargo, if he did at all. As detailed in Part I, above, Plaintiffs view the testimony of one EMS responder as establishing Ruth did not tell EMS about McCargo's condition, while Ruth himself maintains he did. Furthermore, Plaintiffs have introduced evidence that when the two arrived at the Bradley County Jail, at least one corrections officer wanted McCargo medically cleared before being accepted into the jail (Hicks Aff. ¶ 7). Ruth apparently responded "Mr. McCargo had been evaluated by EMS and that he would not be taking Mr. McCargo to the hospital" (Berger Aff. ¶ 7). Plaintiffs also maintain Ruth did not inform Defendant Linder, the jail nurse, about McCargo's condition upon entering the jail, though the Cleveland Defendants dispute this. Linder testified he did not remember Ruth telling him anything about McCargo drinking alcohol, smoking marijuana, or having something white in his mouth, though Ruth may have said "something about [McCargo] being either high and/or drunk, but that was about it" (Linder Dep. at 71).

On these facts, a reasonable jury could conclude Ruth was aware of a risk to McCargo's health, and drew an inference such a risk in fact existed, but deliberately disregarded it. Even if Ruth did not actively intend to deprive McCargo of medical care, as long as he was aware of McCargo's symptoms in the light of the definition of excited delirium spelled out in his department's policy, he may "not escape liability if the evidence showed that [he] merely refused to verify underlying facts that [he] strongly suspected to be true, or declined to confirm inferences of risk that [he] strongly suspected to exist." *Phillips*, 534 F.3d at 541 (quoting *Farmer*, 511 U.S. at 843 n.8); *see also Carter*, 408 F.3d at 313 ("In most cases in which the defendant is alleged to have failed to provide treatment, there is no testimony about what inferences the defendant in fact

drew. Nonetheless, in those cases, a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component."). Because Plaintiffs have shown genuine issues of material fact on both the objective and subjective components of the deliberate indifference claim, a reasonable jury could conclude Ruth violated McCargo's Fourteenth Amendment right to adequate medical care. Accordingly, the Court will deny Officer Ruth qualified immunity on this claim.

### ii.     Chief of Police Wes Snyder

Even viewing the facts in the light most favorable to Plaintiffs, it is unclear when, if it all, Chief Snyder arrived at the scene after both Officer Ruth and Bradley County EMS personnel. There is no allegation he participated in the initial assessment of McCargo, nor that he had input into Officer Ruth's decision to arrest McCargo or EMS personnel's decision not to transport McCargo to the hospital.

Respondeat superior principles do not apply in § 1983 suits to impute liability to supervisory personnel. Instead, a plaintiff must allege a supervisor condoned, encouraged, or knowingly acquiesced in the alleged misconduct. *Turner v. City of Taylor*, 412 F.3d 629, 643 (6th Cir. 2005); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). In perusing the record and the parties' briefs, the Court can find no evidence or allegation by Plaintiffs that Chief Snyder actively condoned or encouraged Officer Ruth's conduct during or immediately following the February 24 incident. Further, the record reveals no evidence Chief Snyder was subjectively aware of McCargo's medical condition or that a risk to McCargo's health could arise from it.

Therefore, a reasonable jury could not find Chief Snyder, as an individual Defendant, violated McCargo's constitutional rights. Accordingly, Chief Snyder is entitled to qualified

immunity. Chief Snyder did play a role in setting the Cleveland Police Department's policy on police transport of individuals in need of medical attention, and below, the Court will address Chief Snyder's role to the extent it impacts the City of Cleveland's municipal liability.

> ### iii. Bradley County Jail Officers Michael Cooper, Robert Gruver, Richard Cobble, Marshall Hicks, Joleen Hickman, Judy Gilley, Jason Gaddis, Connie Berger, and Terri Nunley

In arguing the Court should not grant summary judgment as to these Bradley County Jail officers, Plaintiffs contend it was "clear that at the time he arrived at the Bradley County jail Mr. McCargo was suffering from a serious medical condition, namely excited delirium" (Court File No. 136, at 19). They maintain McCargo, upon arriving at the jail, manifested the same signs he displayed to Officer Ruth: hallucinations, paranoia, anxiety, and bizarre behavior, in addition to his admitted cocaine use (*id.* at 22). Because McCargo's symptoms were "obvious" to jail personnel, Plaintiffs argue the Court "can assume that the individual Bradley County Defendants inferred that Mr. McCargo's condition warranted emergency hospital care," but that they did not provide him this care (*id.*).

In support of this argument, Plaintiffs offer the testimony of a medical expert, Dr. Steven Perlaky, who opined McCargo was "clearly in a delirious state" when he arrived at the jail, which required "medical management" (Perlaky Dep. at 216). Dr. Perlaky concluded the factors McCargo exhibited on arriving at the jail were "[]characteristic signs of excited delirium" (*id.* at 221). Dr. Perlaky also concluded "there were signs going on with this gentleman that a prudent layperson could've identified that would've warranted this guy to need further medical help" (*id.* at 130). In his deposition answers, Dr. Perlaky based his conclusions off his reading of reports submitted by the individual officers.

The Bradley County Jail Defendants completed a number of reports immediately following this incident (Linder Dep. Ex. 5, at 5–11 (reports of Officers Gruver, Hickman, Nunley, Berger, Nova Jensen, Gilley, McMinn, Inman, Burke, Linder, and an unknown officer)). The officers' reports largely corroborate each other's accounts of the incident. On entering the jail, McCargo was shouting "get the dogs off me" or "the dogs are after me" or words to that effect. Nurse Linder stated to Hickman that McCargo was high on crack and marijuana (*id.* at 5). The reports consistently describe McCargo's physical resistance to officers, from his entry into the jail building until his placement in the restraint chair and the application of the taser. After McCargo had been placed in the restraint chair and had sat there a while, the reports indicate he was "calm and quiet." When Nurse Linder asked McCargo if he was feeling better, McCargo nodded in the affirmative (*id.* at 8–9). None of the affidavits indicate the officers were informed of the possibility McCargo had a white substance in his mouth or had swallowed it during the initial encounter with Officer Ruth and EMS personnel. Nor do the affidavits demonstrate any officer saw any specific symptoms McCargo exhibited other than his repeated references to dogs.

The Sixth Circuit has employed (but not expressly approved) an "obviousness" approach to the objective prong based on the holdings of other circuits. The inquiry is whether an inmate's medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F.3d at 897 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). To be "obvious," the case must generally "involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Id.* (citing *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187–88 (11th Cir. 1994)).

The important issue regarding the objective component is that it is based on what a reasonable, non-medically trained layperson would have actually perceived of McCargo while he was in the jail, such that it should have registered to him or her that McCargo had a sufficiently serious medical condition. It is *not* what Plaintiff's expert *says* a reasonable layperson should have concluded, based on the expert's review of reports of which he lacked firsthand knowledge and drew conclusions from "later stuff" (Perlaky Dep. at 114). The critical distinction between Officer Ruth and the Bradley County Defendants who were at the jail is that there is evidence from which a reasonable jury could conclude Ruth actually saw McCargo's symptoms which he knew were consistent with cocaine psychosis, excited delirium, or drug overdose and failed to do anything about them. In contrast, the Court is not convinced such evidence exists for the Bradley County Defendants, even viewing the evidence the Plaintiffs have put forward in the light most favorable to them. McCargo kept saying "call off the dogs" when he entered the jail, but otherwise he appeared calm (Linder Dep. 8). His repetition of "call off the dogs" may have been consistent with hallucination, but hallucination alone does not necessarily equate to cocaine psychosis—it could be consistent with a number of other pathologies—and these officers could not have been expected, as medical lay people, to diagnose cocaine psychosis from possible hallucinations alone.

Lastly, and perhaps most importantly, Plaintiffs have submitted no evidence the Bradley County Jail Defendants had available to them the same definition of excited delirium that was listed in the Cleveland Police Department's policy. The Court can find nothing to indicate the Bradley County Defendants received training on how to recognize symptoms of excited delirium in the same manner Officer Ruth allegedly had. Without such training or written explanation, it is even less likely that the Bradley County Jail officers, without medical expertise, would have been alerted to

34

recognize hallucination standing alone as a symptom of McCargo's possible cocaine psychosis.[6]

Accordingly, the Court concludes McCargo's medical condition was not obvious to a layperson when he entered the Bradley County Jail, rendering Plaintiffs unable to make their required showing of the objective component of the deliberate indifference test. Because they cannot meet this component, the Court needs not apply the subjective component of the test. The Court, therefore, will grant qualified immunity to the above-named Bradley County Jail Defendants with respect to Plaintiffs' deliberate indifference claim.

### iv.    Nurse Ben Linder

The inquiry for Nurse Linder is slightly different than for his colleagues in the Bradley County Jail because unlike the other officers, Nurse Linder is a medically trained state official. Thus, the question for Linder on the objective component is not whether "even a layperson" would have recognized McCargo's symptoms, *Blackmore*, 390 F.3d at 897, but whether McCargo's signs would have registered to a medically trained jail official with Linder's level of expertise.

In *Bertl*, a number of fellow prisoners testified to the decedent prisoner's visibly suffering from a severe medical condition when he entered the jail, especially given that he "appeared unconscious and nonresponsive and that he shook uncontrollably." 2009 WL 247907, at *2. Jail officers carried the decedent into his cell and laid him on the floor, where prisoners and guards later saw him face down and unconscious. *Id.* at *5. The Sixth Circuit held these circumstances demonstrated the existence of a sufficiently serious medical need, satisfying the objective

---

[6]This lack of training about symptoms of excited delirium is part of one of Plaintiffs' arguments why Bradley County should be subject to municipal liability. For purposes of the qualified immunity analysis, however, the jail officers' lack of training contributes further to the conclusion a reasonable layperson at the jail would not have recognized McCargo's symptoms as being consistent with excited delirium.

component as to the defendant jail nurse.  *Id.*  And in *Dominguez*, the parties agreed the plaintiff

prisoner exhibited a sufficiently serious medical need to a jail nurse where he vomited when he tried

to drink water, slurred his speech, felt dizzy, and exhibited other signs consistent with dehydration.

555 F.3d at 547–48, 550.

In arguing McCargo exhibited symptoms which established his sufficiently serious medical

need, Plaintiffs maintain when he arrived at the jail, McCargo hallucinated, acted paranoid and

anxious, and engaged in bizarre, aggressive, and violent behavior toward corrections officers (Court

File No. 136, at 19).  But the evidence Plaintiffs point to in support of these alleged symptoms is less

than persuasive, even viewed in the light most favorable to them.  The deposition testimony of Nurse

Linder, for example, is nothing so much as an attorney asking Linder whether certain behaviors

could be signs of excited delirium.  For each symptom, Linder answered it could "potentially" be

a sign of excited delirium (Linder Dep. at 178–89).  But this says nothing about whether Linder

actually thought McCargo was suffering from excited delirium when he entered the jail, or

diagnosed him as such—only that Linder thought each sign could potentially be a sign of excited

delirium as to any individual.  Thus, Linder did not specifically identify that McCargo exhibited

certain symptoms consistent with excited delirium when he entered the jail, and even if he had, it

would not have led Linder to make such a diagnosis in light of McCargo's intoxication:

> Q.      So as a nurse at the Bradley County jail, if someone came in for medical
> clearance and was hallucinating but that person was intoxicated, you would not
> classify that as extreme mental behavior?
> A.      No, not necessarily, because intoxication does, you know, present with
> hallucinations sometimes.
> Q.      Okay.  I'm not sure if I understood that.  You said "not necessarily."  Are
> there times when an intoxicated individual who is hallucinating would be considered
> to be engaging in extreme behavior?
> A.      No.

(*id.* at 29–30). According to Linder, only "if the patient is not intoxicated and they're having hallucinations, then that would be considered extreme" (*id.* at 29). Thus, Linder's medical training enabled him to distinguish between what he noticed of McCargo (his hallucinations about dogs combined with his prior use of alcohol, marijuana, and cocaine) and someone who presented hallucinations without being intoxicated. The latter individual would have been more likely to be diagnosed with a sufficiently serious medical condition upon being presented to someone with medical expertise.

Plaintiffs also point to the testimony of Dr. Perlaky, who testified any behavior McCargo exhibited would have been consistent with excited delirium (Perlaky Dep. at 216, 218–21). Yet as the Court explained above, Dr. Perlaky's opinions were not based on his firsthand observation of McCargo at the jail, but on reports he later read and summarized. Neither the testimony of Linder nor Dr. Perlaky establish McCargo exhibited any symptoms consistent with excited delirium besides hallucinating the presence of dogs which were chasing him—certainly not enough to establish an obvious and sufficiently serious medical need in light of McCargo's intoxication.

Accordingly, because a reasonable person would not have recognized McCargo's behavior as exhibiting a sufficiently serious medical need on his entering the jail, Plaintiffs have not met their necessary showing on the objective component of this claim. The Court need not reach the subjective component, and will grant qualified immunity to Nurse Linder on the deliberate indifference claim.

### v. Defendants Calvin Webster, Dan Gilley and Bill Griffith

Dan Gilley was the Bradley County Sheriff at the time this incident occurred; Bill Griffith was the Bradley County Sheriff's Department Deputy Chief (Compl. ¶¶ 28–29). Calvin Webster

was an officer with the Bradley County Sheriff's Department (*id.* ¶ 21). In their response to the Bradley County Defendants' motion for summary judgment, Plaintiffs do not allege or provide evidence of specific instances of wrongdoing in which these Defendants were involved, beyond a general allegation they were individual Bradley County Defendants who played a part in the treatment of McCargo at the Bradley County Jail. Moreover, at least two of these Defendants have testified they had no contact with McCargo (Webster Aff. ¶ 7; Gilley Aff. ¶¶ 16–17) and Plaintiffs have offered no evidence to rebut this testimony. Accordingly, the Court will grant qualified immunity to these officers on the deliberate indifference claim. Additionally, and for the same reasons, the Court will grant qualified immunity to those officers who were not named in the complaint, but who the Bradley County Defendants' motion for summary judgment suggests are named Defendants and were under the same circumstances as Webster, Gilley, and Griffith (Court File No. 124, at 2–3).

### vi. Defendants Tony Moore, Allan Walsh, Mike Boggess, Bill Burtt, Christine Inman

As to these Defendants, there has been no allegation or evidence they were in any way involved in either the events leading up to McCargo's arrest, or in his entry into and detention in the Bradley County Jail. Additionally, Plaintiffs have stated they do not oppose the dismissal of these Defendants (Court File No. 136, at 21 n.10). Therefore, the Court will grant these Defendants qualified immunity and will dismiss them from the action.

### 2. Were the rights clearly established?

For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639

(1987)).  "Although it need not be the case that 'the very action in question has previously been held unlawful, . . . in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (quoting *Anderson*, 483 U.S. at 640).  The Supreme Court noted in *Hope v. Pelzer*, 536 U.S. 730 (2002), that "an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).

"For purposes of determining whether a constitutional right is clearly established, the district court must first look to decisions of the Supreme Court, then decisions of [the] Sixth Circuit and other courts within the circuit, and finally to decisions in other circuits." *Landis v. Baker*, 297 F. App'x 453, 462 (6th Cir. 2008) (citing *Chappel v. Montgomery Fire Prot. Dist. No. 1*, 131 F.3d 564, 579 (6th Cir. 1997)).

Because the Court concluded none of the individual Defendants committed a constitutional violation with respect to Plaintiffs' excessive force claim, the Court turns to determine whether McCargo had a clearly established right to adequate medical care.

The Sixth Circuit has held "in general, the Fourteenth Amendment right of pretrial detainees to adequate medical care is, and has long been, clearly established." *Estate of Ownsby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005). *Ownsby* addressed a situation where an arrestee died shortly after his encounter with police. *Id.* at 609–10.  The Sixth Circuit has also explicitly held a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987. *Heflin v. Stewart County*, 958 F.2d 709, 717 (6th Cir. 1992).  Because there was Sixth Circuit law squarely establishing a pretrial detainee's right to adequate medical care which existed for almost twenty years before the acts alleged here, the Court concludes this right was clearly

established.

In their reply memorandum, the Cleveland Defendants correctly state the law that the qualified immunity inquiry must be done "in light of the specific context of the case, not as a broad general proposition," *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier*, 533 U.S. at 201); that the law must place a defendant on notice that his actions in a specific context would violate a constitutional right, *see Lyons v. City of Xenia*, 417 F.3d 565, 571 (6th Cir. 2005); and the plaintiff bears the burden to show each individual defendant is not entitled to qualified immunity, *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006). However, Plaintiffs here have met these requirements as to Officer Ruth by adducing sufficient evidence to create an issue of material fact regarding whether he is entitled to qualified immunity. Ruth was aware, through his police department training, of the existence of in-custody death syndrome and the symptoms which typically accompanied it. When Officer Ruth first encountered McCargo, the latter manifested a number of those symptoms—hallucinations, paranoia, and bizarre behavior among them. Combined with Officer Ruth's conclusion McCargo was intoxicated, and viewing the facts in the light most favorable to Plaintiffs, McCargo's appearance should have given Officer Ruth pause and led him to consult with more experienced medical personnel. This should have included his conveying to Bradley County EMS personnel McCargo's earlier statement he had been smoking crack cocaine, which could have increased the likelihood the EMS responders would have taken more action when they thought McCargo may have had a white substance in his mouth.

Further, though the Cleveland Defendants rely heavily on *Weaver* to contend Officer Ruth reasonably believed their actions would not violate McCargo's constitutional rights, *Weaver*'s facts are readily distinguishable from those here, such that any reliance on that decision would be

misplaced under the circumstances of McCargo's case. *Weaver* gives no indication the police officers in that case had been trained on in-custody death syndrome or that the police department had a policy to that effect. While the *Weaver* court found the city officers were not deliberately indifferent to the decedent's medical needs, it did so because "the Officers did not see, or otherwise have knowledge, that [the decedent] ingested cocaine," 340 F.3d at 411, and because the decedent's behavior when officers first encountered him appeared suspicious but did not include signs of hallucination or paranoia, *id.* at 401–02.

In this situation, Officer Ruth had knowledge, in the specific context of his encounter with McCargo, that failure to provide adequate medical care, or at least consult further with trained medical personnel, would be a violation of McCargo's constitutional rights. Accordingly, the Court concludes the right was clearly established for Defendant Officer Ruth, and hence Officer Ruth is not entitled to qualified immunity.

### 3. Summary

On Plaintiffs' excessive force claim, the Court concluded a reasonable jury could not find any of the individual Defendants violated McCargo's constitutional right to be free from excessive force. Accordingly, the Court did not need to reach the question of whether that right was clearly established, and will grant qualified immunity to all the individual Defendants on that claim. On Plaintiffs' inadequate medical care claim, the Court concluded a reasonable jury could find Officer Ruth violated McCargo's constitutional right, and that the right was clearly established with regard to the particular circumstances Officer Ruth encountered at the scene. Accordingly, the Court will deny qualified immunity to Officer Ruth. As to the other individual Defendants, no reasonable jury could find they violated McCargo's right to adequate medical care, and as such, there is no need to

41

inquire whether that right was clearly established. Those other individual Defendants, with the exception of Officer Ruth, are entitled to qualified immunity on Plaintiffs' adequate medical care claim as well.

### C. Summary Judgment on the Merits of Plaintiffs' Excessive Force and Deliberate Indifference Claims as to the Individual Defendants

Defendants moved for summary judgment on the merits of the excessive force and deliberate indifference claims, notwithstanding their arguments for qualified immunity. Because the Court dismissed all the individual Defendants from Plaintiffs' excessive force claim on qualified immunity grounds, it will grant summary judgment on that claim. Officer Ruth is the only individual Defendant remaining on Plaintiffs' deliberate indifference claim. For the reasons stated in the Court's qualified immunity analysis, there is a genuine issue regarding whether Officer Ruth violated McCargo's constitutional right to adequate medical care. Accordingly, the Court will deny summary judgment on that claim as to Officer Ruth.

### D. Conspiracy to Violate Civil Rights (42 U.S.C. § 1985)

Defendants move for summary judgment on Plaintiff's § 1985 conspiracy claim, arguing Plaintiff cannot prove the essential elements of this claim, especially that the conspiracy must be motivated by racial, or other class-based, invidiously discriminatory animus. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971); *Peters v. Fair*, 427 F.3d 1035, 1038 (6th Cir. 2005). Plaintiffs do not contest the dismissal of this claim (Court File No. 136, at 15 n.5). Accordingly, the Court will grant summary judgment on the § 1985 claim and dismiss it.

### E. Municipal Liability (*Monell*) Claims Against City of Cleveland and Bradley County

The two municipal Defendants, the City of Cleveland and Bradley County, move for

42

summary judgment on the theory Plaintiff has not provided sufficient evidence to create a factual issue showing the cities have policies condoning the use of inappropriate force or deliberate indifference to medical needs. Plaintiffs respond by contending a reasonable jury could find both Defendants had in place policies or customs which occasioned unconstitutional deliberate indifference to McCargo's needs during the February 24 incident.

The Supreme Court has held municipalities may constitute "persons" acting under color of state law subject to § 1983 liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). There are two important questions to answer in analyzing § 1983 claims against municipalities. First, was the plaintiff's harm caused by a constitutional violation? If yes, was the city responsible for that violation? *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *accord Cash v. Hamilton County Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004). If no constitutional violation by the municipality's individual defendants is established, the municipal defendants cannot be held liable under § 1983. *Bukowski v. City of Akron*, 326 F.3d 702, 712–13 (6th Cir. 2003); *Watkins*, 273 F.3d at 687.

As for the second question, municipalities are only liable for constitutional violations to the extent the violations resulted from official policies and customs. *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997); *Monell*, 436 U.S. at 691; *Cummings v. City of Akron*, 418 F.3d 676, 684 (6th Cir. 2003). "It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible." *Monell*, 436 U.S. at 694; *accord Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005). The plaintiff must prove a direct causal link between the existence of the policy or custom and the alleged constitutional

43

violation, in order to determine the municipality's deliberate conduct was the "moving force" behind the violation. *Brown*, 520 U.S. at 404; *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). Merely demonstrating a municipality's employee committed a constitutional violation is insufficient, as respondeat superior principles do not apply to § 1983 actions. *Brown*, 520 U.S. at 402; *Monell*, 436 U.S. at 691; *Johnson*, 398 F.3d at 877.

To demonstrate the existence of an illegal municipal policy or custom, a plaintiff may use at least four sources: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). To prove a policy's existence, the plaintiff must demonstrate deliberate indifference by the local government—a deliberate or conscious choice to fail to train its employees. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989). "In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.'" *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (quoting *Brown*, 520 U.S. at 412). However, a municipal policy can give rise to § 1983 liability as long as it causes constitutional violations because of a lack of training, even if it is not itself unconstitutional. *Id.* at 387.

As another means to establish liability, a plaintiff may prove a municipality had a custom in place which caused a constitutional violation, even if the custom was not formally sanctioned. *Pembauer v. City of Cincinnati*, 475 U.S. 469, 482 n.10 (1986). One court has described municipal liability by custom as deriving "not from its creation of the custom, but from its tolerance or acquiescence in it." *Britton v. Maloney*, 901 F. Supp. 444, 450 (D. Mass. 1995). The Sixth Circuit

defines custom as a "practice [which] is so widespread as to have the force of law." *Ford v. County of Grand Traverse*, 535 F.3d 483, 496 (6th Cir. 2008) (quoting *Brown*, 520 U.S. at 404). "A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004).

With the foregoing law in mind, the Court turns to evaluate municipal liability as to the City of Cleveland and Bradley County.

### 1.     City of Cleveland

The Cleveland Defendants, relying heavily on the affidavit of Defendant Chief Snyder, argue the city's official policies do not condone or encourage constitutional violations and that the city's police officers require adequate training. In response, Plaintiffs assert the City of Cleveland could be liable under three theories of deliberate indifference: (1) Defendant Chief Wes Snyder's "no transport" policy (Court File No. 135, at 22–24); (2) failure to investigate and discipline Ruth after his arrest of McCargo (*id.* at 24–26); and (3) failure to train the city's officers on the in-custody death policy (*id.* at 26–28).

As for the first prong of the municipal liability inquiry, the Court concluded above a reasonable jury could find one of the individual Cleveland Defendants, Officer Ruth, violated McCargo's constitutional right to be free from deliberate indifference to his serious medical needs. The Court adopts that reasoning here and focuses on the second prong, whether a policy existed which was the "moving force" behind the constitutional violation, as to each of Plaintiffs' theories.

### a.     "No transport" policy

As the Court determined above, a jury could conclude McCargo presented symptoms

consistent with excited delirium when Officer Ruth first encountered him. McCargo's symptoms fell within the definition of excited delirium promulgated by the Cleveland Police Department in its in-custody death syndrome policy (Bronze Dep. Ex. 14). The policy also directed an officer observing these symptoms to transport the suspect to a hospital emergency room for treatment (*id.*). Also in place at the time, however, was Chief Snyder's written memorandum prohibiting his officers from transporting any individual in a police vehicle for medical services (Court File No. 135 Ex. 6). Detective Bronze, who investigated the February 24 incident, testified it was a "customary thing" for officers not to transport arrestees in police vehicles, but instead to send them in an ambulance (Bronze Dep. at 123).

Viewed in the light most favorable to Plaintiffs, at the time Officer Ruth arrested McCargo, there was a conflict between the directives of Cleveland's in-custody death syndrome policy (which instructed police to transport suspects with signs of excited delirium to the hospital) and Chief Snyder's policy (prohibiting police from using their vehicles to transport suspects to the hospital). The in-custody death syndrome policy makes no provision for police to use the services of a third party, such as EMS personnel, to transport a suspect to the hospital. Rather, read most favorably to Plaintiffs, the policy instructs police to do so themselves.[7] In turn, this conflict was the moving force behind the violation of McCargo's constitutional rights. Officer Ruth had to choose one of

---

[7]Defendants reply that Chief Snyder's memorandum contained "no blanket prohibition to obtain medical treatment" because it provided that "[i]f someone complains or shows signs of physical trauma, call an ambulance" (Court File No. 139, at 8–9). This misconstrues the inquiry, however. Cleveland police officers still could not transport suspects with symptoms of excited delirium themselves; they had to call upon a third-party ambulance service to do it. The issue for purposes of municipal liability is whether this policy prevented Cleveland *police* from transporting excited-delirium suspects, and whether this failure contributed to McCargo's coma and death. Defendants, in their reply, do not introduce evidence countering Plaintiffs' argument the conflicting policies prevented the police from transporting such suspects.

46

the mutually exclusive policies, and chose to follow Chief Snyder's order. He transported McCargo not to the hospital, but to the Bradley County jail—indeed, he did not even ask Bradley County EMS to transport McCargo in an ambulance. This denied McCargo medical treatment at the hospital which, in the opinion of Plaintiff's expert, would have saved McCargo's life (Perlaky Dep. at 100–10)

Relying heavily on Chief Snyder's affidavit, Defendants maintain the City of Cleveland's official policies "do not condone or encourage the violation of constitutional rights," that the police department "does not have a history of failure to provide medical care to arrestees," and that Cleveland police officers' training meets or exceeds Tennessee standards (Court File No. 123, at 22–23). It is not surprising Chief Snyder would make out an affidavit to this effect—as a Defendant and representative of his municipality, he has a reason to cast his department's actions in a favorable light. At trial, a jury could give his testimony on this matter as much or as little weight as it chooses, and the Court takes no position on Chief Snyder's credibility now. At the summary judgment stage, though, there is a fundamental dispute between Chief Snyder's positive account of his police department's policies and the evidence submitted by Plaintiffs which, viewed in the light most favorable to them, paints a less rosy picture. This factual dispute precludes summary judgment on this theory.

### b. Failure to investigate and discipline

A failure to investigate can give rise to supervisory liability under § 1983. *Loy v. Sexton*, 132 F. App'x 624, 627 (6th Cir. 2005) (citing *Walker v. Norris*, 917 F.2d 1449, 1457 (6th Cir. 1990)). However, the Sixth Circuit requires a "strong" indication of unconstitutional conduct before a failure to investigate becomes unreasonable. *See id.* (citing *Doe v. City of Roseville*, 296 F.3d 431, 439 (6th

47

Cir. 2002) (holding that supervisors were not liable because they possessed no information indicating "a strong likelihood" of unconstitutional conduct by their subordinate)).

Here, the Court is unconvinced Officer Ruth's supervisors had a "strong indication" he was responsible for unconstitutional conduct after they conducted their investigation of the February 24 incident. Detective Bronze, who was responsible for leading the Internal Affairs investigation, never affirmatively concluded Officer Ruth violated the policy on taking a suspect showing excited delirium symptoms to the emergency room. He testified Ruth violated no other policies in his handling of the incident (Bronze Dep. at 130–31). The Internal Affairs report on the incident concluded Officer Ruth "upheld" the in-custody death syndrome policy, along with other Cleveland Police Department policies, in his encounter with McCargo, and that he followed appropriate guidelines (Bronze Dep. Ex. 14). Plaintiffs argue Detective Bronze failed to verbally interview Officer Ruth's supervisor, Lieutenant Anderson, and a trainee, Al Roach, who was present at the Bradley County Jail when McCargo arrived (Bronze Dep. at 65–66). However, Bronze testified he obtained written statements from those officers and used them in his investigation (*id.* at 75–76).

On these facts, the Court does not conclude the Cleveland Police Department conducted an inadequate investigation which was the moving force behind the violation of McCargo's constitutional rights. Accordingly, the Court will grant summary judgment on this theory of the City of Cleveland's liability.

### c.    Failure to train

Inadequacy of police training may serve as a basis for § 1983 municipal liability, but only where failure to train amounts to deliberate indifference to the rights of persons with whom police come into contact—that is, deliberate indifference to the injuries likely to result from a failure to act.

48

*City of Canton*, 489 U.S. at 388; *see also Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005). A plaintiff bringing such a claim must prove "that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is closely related to or actually caused the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (internal citation and quotations omitted). To succeed on this claim, a plaintiff must prove: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)).

Here, Plaintiffs cite to deposition testimony from Lieutenant Lamar Anderson, Officer Ruth's supervisor, which purports to show Ruth was not adequately trained for the task of recognizing individuals with excited delirium and transporting them to the hospital. In its review of Lieutenant Anderson's testimony submitted as an exhibit to Plaintiffs' response (Court File No. 135 Ex. 1), however, the Court cannot find the transcript pages which, Plaintiffs represent, contain the relevant testimony. Nor can the Court find the deposition excerpt cited by Plaintiffs in the pages of transcript they *have* provided.

In opposing a motion for summary judgment, it is a plaintiff's burden to submit significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324. And,

> Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. . . . Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact.

*Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007) (quoting *Skotak v. Tenneco*

49

*Resins, Inc.*, 953 F.2d 909, 916 n.7 (5th Cir. 1992)). Because the first prong of the *Ellis* test is essential to a failure to train claim, and because Plaintiffs lack significant probative evidence in light of the absence of relevant deposition testimony, the Court will grant summary judgment on the failure to train claim.

### 2. Bradley County

Plaintiffs assert Bradley County could be liable under two theories of § 1983 deliberate indifference: (1) the county's policy or custom of forbidding its EMS personnel to transport non-responsive detainees to the hospital despite their medical condition (Court File No. 136, at 31–34); and (2) the jail medical clearance policy or custom was unconstitutional because it lacked definable standards and gave undue deference to a detainee's intoxication (*id.* at 34–38).

### a. EMS transport policy or custom

EMS responders John Tyler and Matt Whittmaier disagree about several aspects of McCargo's condition when they arrived at the scene. Tyler testified McCargo told him he had been chased by a dog (Tyler Dep. at 106) while Whittmaier maintained McCargo "did not appear to be suffering from any hallucinations. . . . He did not claim that there were any dogs present or show any other signs that he was delusional" (Whittmaier Aff. ¶ 12). Whittmaier assessed McCargo as appearing "slightly intoxicated" (*id.* ¶ 10) while Tyler testified it "wasn't obvious" McCargo appeared intoxicated (Tyler Dep. at 111). Tyler thought he observed a white substance in McCargo's mouth (*id.* at 120) while Whittmaier "visually inspected Mr. McCargo's mouth and there was nothing present and Mr. McCargo denied putting anything in his mouth" (Whittmaier Aff. ¶ 8). However, the responders do agree they saw no visible signs of a serious medical condition other than McCargo's intoxication, and that they were prevented from transporting McCargo to the hospital

50

because he did not respond when asked if he wanted medical assistance (Tyler Dep. at 50–51; Whittmaier Aff. ¶¶ 14, 16).

Plaintiffs' medical expert, Dr. Perlaky, viewed the evidence differently. He opined that McCargo showed signs of delirium (Perlaky Dep. at 93–94), that his condition "mandated transfer to the emergency room" and he "should've been transported by the EMS on the initial presentation" (*id.* at 114–15), and that if Bradley County EMS had transported McCargo to the hospital, he would have survived (*id.* at 100–01). The Bradley County defendants dispute the latter conclusion, and their expert opined it was "definitely speculation that Mr. McCargo would have survived if he had been transported to the emergency room for evaluation" (Newby Aff. Ex. B). As the Court noted above, however, Dr. Perlaky based his conclusions on his reading of reports submitted by others, not his first-hand observations.

Based on this evidence, the Court is unconvinced Plaintiffs have met their burden to show McCargo's constitutional rights were violated by the EMS transport policy. One of the EMS personnel, Whittmaier, actually checked McCargo's mouth and saw nothing inside. McCargo did not state he had digested anything; in fact, in response to exactly such a question, he did not state anything at all. With this information in mind, the EMS personnel decided McCargo was merely intoxicated and released him to Officer Ruth. In light of the circumstances, EMS personnel's conclusion was a reasonable one.

Mindful of this conclusion, the Court turns to any effect on McCargo's outcome such a transport policy would have had. The Court can find no cases suggesting that when EMS personnel encounter an intoxicated individual they are constitutionally obligated to take that person to a hospital against the person's will—particularly where EMS personnel have inquired as to that

51

person's medical condition multiple times and received no response. If the requirement had been for Bradley County EMS to take every intoxicated person they encountered to jail, without first sending them to the hospital, such a situation would have implicated Fourth Amendment arrest law. Here, however, Officer Ruth did not place McCargo under arrest until EMS personnel either prepared to leave or had left. Even viewed most favorably to Plaintiffs, any policy by Bradley County EMS concerning detainee transport, to the extent one existed, did not result in a violation of McCargo's constitutional rights.

Because a jury could not conclude any custom against transporting non-responsive detainees interfered with McCargo's constitutional right to adequate medical care and contributed to his death, summary judgment on this theory is appropriate.

### b. Jail medical clearance policy or custom

In its analysis of qualified immunity above, the Court concluded the individual Bradley County Defendants could not be held liable, owing in part to the lack of training or a policy about excited delirium. Such a policy could have given a non-medically trained layperson the knowledge necessary to conclude the symptoms McCargo exhibited upon entering the jail were consistent with cocaine psychosis. Now, Plaintiffs contend the absence of such training or a definition in the jail medical clearance policy, together with a lack of definable standards and "undue deference" to a detainee's intoxication, combined to deprive McCargo of his constitutional rights and lead to his injuries and death (Court File No. 136, at 34–38).

A determination municipal officials did not violate an individual's constitutional rights resolves the claim against the municipality, because respondeat superior does not apply to § 1983 actions. *Bukowski*, 326 F.3d at 712–13 (citing *Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir.

2000) (noting that the "conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well")). In this case, the Court concluded above that the individual Bradley County Jail Defendants did not commit a constitutional violation because it would not have been immediately obvious to a layperson McCargo's symptoms were consistent with excited delirium. Because the individuals responsible for executing Bradley County's jail clearance policy did not violate McCargo's constitutional rights, the municipality cannot be responsible for a constitutional violation either. Accordingly, the Court will grant summary judgment on this theory of Bradley County's liability.

### 3. Summary

As to the municipal liability of the City of Cleveland, the Court will deny summary judgment on Plaintiffs' "no transport" theory. It will grant summary judgment on Plaintiffs' failure to investigate or discipline and failure to train theories. As to the municipal liability of Bradley County, the Court will grant summary judgment on both Plaintiffs' EMS transport policy theory and on their jail medical clearance policy theory.

### F. Failure to Intercede under § 1983

Plaintiffs' complaint contained a claim under § 1983 for failure to intercede (Compl. ¶¶ 127–31). The Cleveland Defendants moved for summary judgment on this claim, arguing Plaintiffs could not produce evidence any city employee witnessed or was involved in an assault and taser-shocking of McCargo (Court File No. 123, at 12–13). As the Cleveland Defendants point out, Plaintiffs do not address this failure to intercede claim in their response to summary judgment. There being no genuine issue of material fact, the Court will grant summary judgment on this claim.

### G. State Law Claims for Negligent Training and Supervision and Malicious Harassment, and Claim under the Tennessee Human Rights Act

53

In their responses to Defendants' motions for summary judgment, Plaintiffs have stated they do not oppose the dismissal of these claims (Court File No. 135, at 30 n.7; Court File No. 136, at 38 n.14). Because this means there can be no dispute as to any material element of these claims, the Court will dismiss the claims.

H.    **State Law Assault and Battery, Negligence, Loss of Consortium, and Malpractice Claims**

Defendants argue Plaintiffs' state law negligence claim must fail because the individual Defendants are entitled to immunity under state statutes, and because the municipalities did not engage in conduct which rose to the level of negligence. Plaintiffs respond by incorporating their arguments in opposition to summary judgment on their § 1983 claims, arguing especially that the municipalities are liable because the negligent actions of their employees proximately caused McCargo's injuries and death.

Under the Tennessee Governmental Tort Liability Act ("TGTLA"), "[i]mmunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of . . . civil rights." Tenn. Code Ann. § 29-20-205. This Court has previously construed "civil rights" to include claims arising under the federal civil rights laws and the United States Constitution. *Willis v. Neal*, 2006 WL 270288, at *17 (E.D. Tenn. Feb. 1, 2006), *vacated on other grounds*, 2006 WL 1129388 (E.D. Tenn. Apr. 24, 2006); *Hale v. Randolph*, 2004 WL 1854179, at *17 (E.D. Tenn. Jan. 30, 2004). The Sixth Circuit has held "the Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts. This unequivocal preference of the Tennessee legislature is an exceptional circumstance [under 28 U.S.C. § 1367(c)] for declining jurisdiction." *Gregory v. Shelby County, Tenn.*, 220 F.3d 443, 446 (6th Cir. 2000), *abrogated on other grounds*

54

*as recognized in DiLaura v. Twp. of Ann Arbor*, 471 F.3d 666, 671 n.2 (6th Cir. 2006). In light of

this preference, when a plaintiff's alleged state law claims arise from her federal civil rights claims,

dismissal of the municipal defendant(s) on immunity grounds is appropriate. *See Willis*, 2006 WL

270288, at *17; *McCutchen v. Tipton County*, 430 F. Supp. 2d 741, 748–49 (W.D. Tenn. 2006).

Here, like in *Willis* and *Hale*, Plaintiffs' state law claims against the City of Cleveland and Bradley

County "clearly arise out of and directly flow from the allegations that . . . officers deprived

[McCargo] of his civil rights by . . . using excessive force" and being deliberately indifferent to

McCargo's serious medical needs. *Hale*, 2004 WL 1854179, at *17. Plaintiffs bring their state law

claims in the context of a federal civil rights case; hence, their alleged injuries arise out of "civil

rights" and the municipalities are entitled to immunity under the TGTLA. *See Willis*, 2006 WL

270288, at *17. Accordingly, the Court will grant summary judgment on and dismiss the above-

named state law claims against Bradley County and the City of Cleveland.

The Court must next address the individual Defendants of both municipalities. Under the

TGTLA, "if the governmental entity is not amenable to suit—in other words, if immunity has not

been removed by § 29-20-205—then employees of the entity are proper party-defendants." *Willis*,

2006 WL 270288, at *17 (citing Tenn. Code Ann. § 29-20-310(c)). That is, the TGTLA "addresses

the liability of governmental entities only. Its jurisdictional limitations do not apply to persons sued

individually." *McCutchen*, 430 F. Supp. 2d at 748 (quoting *Timberlake v. Benton*, 786 F. Supp. 676,

697 (M.D. Tenn. 1992)). While the *Timberlake* court chose, in the name of judicial efficiency, to

exercise supplemental jurisdiction over the state law claims against officers in their individual

capacities, a district court also has discretion not to hear those claims. *See Experimental Holdings,

Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007) (reading a federal district court's dismissal of state

55

law individual-capacity claims as discretionary to avoid needless decisions of state law and promote comity). Naturally, such a dismissal is without prejudice to re-file those claims in state court. *Id.*

Here, the Court assumes, without expressly holding, Plaintiffs sued the individual Defendants in their individual, not official, capacities.[8] The Court finds concerns of judicial economy are not adversely affected by allowing Plaintiffs' state law claims to be heard in state court. Those claims involve issues affecting Tennessee communities, and the Court feels state courts are better placed to respond to those communities' concerns. To promote comity, the respect for the decisions of state courts and the Tennessee legislature, and in light of that legislature's preference for TGTLA claims to be handled by state courts, the Court will dismiss these state law claims against the individual Defendants, without prejudice to re-file in state court.

## IV. CONCLUSION

Having carefully considered the parties' submissions and evidence in the record, and for the reasons stated above, the Court will take the following action:

The Court will **GRANT** summary judgment to all individual Defendants on Plaintiffs' excessive force claim, based on qualified immunity. The Court will **GRANT** summary judgment as to all but one of the individual Defendants on Plaintiffs' deliberate indifference claim, based on

---

[8]The parties dispute this. The individual Defendants argue most of them have been sued in their official capacities because, with the exception of Defendants Snyder, Gilley, and Griffith, the caption of the complaint does not state they are sued in their individual capacities. Plaintiffs correctly cite Sixth Circuit law, however, which holds the appeals court has "never applied such a strict interpretation" of § 1983 as requiring plaintiffs to affirmatively plead "individual capacity" in the complaint. *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001). While it is "clearly preferable" for plaintiffs to expressly state whether a defendant is sued in his individual capacity, "failure to do so is not fatal if the course of proceedings otherwise indicates that the defendant received sufficient notice" he would be held personally liable. *Id.*

qualified immunity. The Court will **DENY** Officer Matthew Ruth's claim for qualified immunity on Plaintiffs' deliberate indifference claim.

The Court will **GRANT** summary judgment on the merits of Plaintiffs' excessive force claim, and will **DENY** summary judgment on the merits of Plaintiffs' deliberate indifference claim with respect only to Officer Ruth. As to all other Defendants, the Court will **GRANT** summary judgment on this claim.

The Court will **GRANT** summary judgment to the City of Cleveland on Plaintiffs' failure to investigate and discipline and failure to train theories of municipal liability, but will **DENY** summary judgment on Plaintiffs' "no transport" policy theory. The Court will **GRANT** summary judgment to Bradley County on Plaintiffs' jail medical clearance policy theory and on Plaintiffs' EMS transport policy theory. The Court will **DISMISS** Bradley County as a municipal defendant.

The Court will **GRANT** summary judgment on Plaintiffs' § 1985 claim and § 1983 failure to intercede claim and will **DISMISS** those claims.

The Court will **GRANT** summary judgment on Plaintiffs' state law claims for negligent training and supervision and malicious harassment, and their claim under the Tennessee Human Rights Act, and will **DISMISS** those claims. Lastly, the Court will **GRANT** summary judgment on Plaintiffs' state law claims for assault and battery, negligence, loss of consortium, and malpractice. The Court will **DISMISS** those claims, except that regarding the individual Defendants, the dismissal is without prejudice to refile in state court.


An Order will enter.

**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**